**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **FRANK PADOUR,** ) | |
| ) | **No. 17 CV 1743** |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Magistrate Judge Young B. Kim** |
| ) | |
| **NANCY A. BERRYHILL, Acting** ) | |
| **Commissioner, Social Security** ) | |
| **Administration,**[1] ) | |
| ) | **February 14, 2018** |
| **Defendant.** ) | |

**MEMORANDUM OPINION and ORDER**

Frank Padour seeks a period of disability and disability insurance benefits ("DIB") based on his claim that he is disabled because of diabetes, high blood pressure, high cholesterol, pancreatic surgery, prostate cancer, poor eyesight, and chronic obstructive pulmonary disorder ("COPD"). After the Commissioner of the Social Security Administration denied his application, Padour filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Padour's motion is denied and the government's is granted:

**Procedural History**

Padour filed his application for DIB on April 1, 2013, claiming a disability onset date of January 1, 2005. (Administrative Record ("A.R.") 83.) After his claim was denied initially and upon reconsideration, (id. at 5-8), Padour sought and

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is automatically substituted as the named defendant in this case.

received a hearing before an Administrative Law Judge ("ALJ") which took place on November 20, 2014, (id. at 37-81). On June 8, 2015, the ALJ issued a decision concluding that Padour is not disabled and therefore not entitled to DIB. (Id. at 25-32.) When the Appeals Council denied Padour's request for review, (id. at 1), the ALJ's decision became the final decision of the Commissioner, *see Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Padour filed this lawsuit seeking judicial review of the Commissioner's final decision, *see* 42 U.S.C. § 405(g); (R. 1), and the parties have consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 13).

**Background**

Following a nine-year career in professional golfing, Padour worked as a golf course manager from 1995 until 2001, after which he reported working part-time as a nightclub manager from 2003 until 2006. (A.R. 273.) Padour asserts that beginning in January 2005, at the age of 55, his health declined drastically and prevented him from working on a full-time basis. During the November 2014 hearing, Padour presented medical and testimonial evidence in support of his disability claim.

**A.   Medical Evidence**

After complaints of shortness of breath, Padour had an echocardiogram in January 2005. (A.R. 451.) The medical record lists cigarette smoking as a risk factor, (id.), and Padour reported that he smoked two packs of cigarettes a day for 20 years, (id. at 338). The test results showed no evidence of stress-induced myocardial ischemia and that Padour's left ventricular function was well preserved.

2

(Id. at 453.) Padour was then treated for hypertension and COPD, which was noted as stable in March 2005. (Id. at 474.) Two months later in May 2005, Padour underwent a distal pancreatectomy and splenectomy to remove a benign cyst of the pancreas. (Id. at 507-33.) His physician's notes reveal that "there were no complications of this procedure." (Id. at 509.) Following the surgery, Padour became a diabetic and began taking insulin. (Id. at 564.) By August 2005, Padour's hypertension was described as "well controlled." (Id. at 475.) Later that month, Padour had an arterial exam because of a bilateral limping of his legs. (Id. at 483.) The exam revealed that blood circulation in his right leg was within normal limits, but his left leg showed signs of superficial femoral artery disease, infrapopliteal artery disease, and limping. (Id.) The following year in May 2006, Padour was diagnosed with prostate cancer. (Id. at 332.) He underwent a radical prostatectomy on June 12, 2006. (Id. at 363.) His physician's notes from June 2006 to April 2007 show that Padour had "no complaints" and was "comfortable and in no apparent distress." (Id. at 340-57.)

**B.    Padour's Hearing Testimony**

Padour described his symptoms and medical treatment at his November 2014 hearing. He testified that he became disabled on January 1, 2005, when his health began to decline rapidly. (A.R. 46-47.) Padour underwent pancreatic surgery that year, leading him to develop diabetes. (Id. at 51.) He explained that the surgery also caused him to experience pain in his feet and legs, which made it difficult to stand up, and that he would get tired immediately. (Id.) Padour testified that he

3

developed COPD at some point and was later diagnosed with prostate cancer. (Id. at 47, 51.)

When asked about his daily activities from January 2005 through December 2007, Padour testified that he did not work or socialize much and spent his time recovering from his surgeries. (Id. at 50.) He also noted that he did not smoke or drink during his recovery. (Id. at 49.) He stated that sometimes the pain would be so bad that he could not leave the house and that he moved his bedroom from upstairs to downstairs to have easier access to his backyard. (Id. at 54.)

Regarding his work history, Padour testified that he had been a professional golfer for about 10 years, but lost interest in playing the game. (Id. at 49.) Over time he became more interested in the business side of golf and began leasing two golf course facilities from a county forest preserve in the late 1990s. (Id. at 42.) Padour testified that he was responsible for overseeing the golf courses, which included a golf shop and restaurant. (Id. at 43.) He also purchased golf equipment and supervised three to four employees. (Id.)

From 2003 until 2006, Padour worked at a friend's nightclub two days a week. (Id. at 56.) He explained that this job was "a gift," and that he did not do much when he reported for work. (Id.) About a year before the hearing, Padour worked briefly for a golf store one day a week. (Id. at 42.) When asked why he waited until April 2013 to file for disability, Padour answered, "I didn't know you could do that." (Id. at 47.) He thought he would have no problem finding another job because of his background in the golfing industry. (Id.) Padour further testified

4

that even if he could have found a job during that time, it would have been difficult to work because he could not spend more than 15 to 20 minutes on his feet at one time and his doctors had restricted him from doing any lifting. (Id. at 52.)

**C.     Medical Expert's Hearing Testimony**

Dr. Ashok Jilhewar, a medical expert ("ME"), testified at the hearing and opined about the limiting effects of Padour's impairments. The ME said that although Padour developed diabetes following his pancreatic surgery, the long-term complications are not the same as an individual who had developed the disease naturally. (A.R. 59.) He pointed out that Padour's medical record did not indicate "much of a follow up" in relation to the pancreatic cyst. (Id.) The ME did not find any record of recurrence of prostate cancer or any symptoms in relation to Padour's prostatectomy. (Id. at 61.) He noted that both Padour's pancreatic cyst and prostate cancer were documented for "significantly less than one year in the medical record." (Id. at 67.) The ME explained that Padour's stress test revealed that he could walk for five minutes on the treadmill and the normal range for a person his age is seven minutes. (Id. at 65.) The ME further opined that Padour's most serious impairment during the time period at issue was COPD. (Id. at 66.) The ME concluded that Padour was limited to "little capacity," (id. at 66), and could perform light work in "neutral" environments with additional postural limitations, (id. at 66, 68) during the relevant time period.

## D. Vocational Expert's Hearing Testimony

The ALJ also heard the testimony of a vocational expert ("VE") about the jobs available to someone with Padour's limitations. Based on the Dictionary of Occupational Titles ("DOT"), the VE determined that Padour's past relevant work as a golf course manager would be classified as a "sedentary, skilled, SVP 6 per DOT light as performed." (A.R. 71.) His work as a nightclub manager would be classified as "light, skilled, SVP 6 per DOT, sedentary as performed." (Id.)

The ALJ asked the VE a series of hypothetical questions regarding an individual with the same age, education, and work experience as Padour. First, the ALJ asked about the jobs this individual could perform if he or she had a residual functional capacity ("RFC") to perform light work. (Id.) The ALJ further specified that this individual could frequently climb ramps and stairs but never ladders, ropes, or scaffolds, frequently balance, stoop, kneel, crouch, and crawl, and could tolerate frequent exposure to work around fumes, gases, and other pulmonary irritants. (Id.) The VE opined that such hypothetical person would be able to perform any of Padour's past relevant work. (Id.)

In the second hypothetical, the ALJ asked about the jobs the same individual could perform if he or she were limited to occasional exposure to fumes, gases, and other pulmonary irritants. (Id. at 72.) The VE responded that this individual would be limited to performing the work at the nightclub. (Id.) She explained that golf course work would be excluded "because of the weather," but "the nightclub would not have any type of direct contact or exposure to any type of pulmonary

irritants or fumes or gases." (Id.) The ALJ then clarified to the VE that she did not consider the weather to be a pulmonary irritant. (Id. at 73.) The VE then revised her answer and stated that the individual could perform all past relevant work. (Id.)

Finally, the ALJ asked what jobs the individual could perform if he or she could not tolerate any exposure to or work around fumes, gases, and other pulmonary irritants. (Id. at 74.) The VE responded that "all past relevant work would remain." (Id.) The VE further testified that the individual could not miss more than one day per month in a competitive work environment. (Id.)

Padour's attorney asked the ALJ why the weather was not considered a pulmonary irritant. (Id. at 75.) The ALJ answered that in her opinion, "temperature would be extreme cold and heat . . . [a]nd we're talking about fumes, gases, pulmonary irritants." (Id.) The ALJ then asked the VE if the DOT includes a definition for pulmonary irritants, and the VE responded, "They don't exactly address what they classify as pulmonary irritants." (Id.) Based on her past relevant work experience, the VE also opined that Padour's transferable skills were "managing, supervising others, ordering inventory, customer service" and that Padour would be capable of performing work as a restaurant manager. (Id. at 76.) She added that there are about 3,500 such positions in Illinois and about 250,000 nationwide. (Id.)

7

### E. Post-Hearing Treating Source Statements

Following the hearing, Padour submitted treating source statements from his treating physicians. In June 2014,[2] Padour's long-time primary care physician, Dr. Amit Joshi, wrote a letter on behalf of Padour in which he opined that Padour's "health has deteriorated significantly recently over the last several months" caused by his cardiac disease and COPD." (A.R. 593.) He also stated that Padour's "overall health has declined over the last one year in a drastic fashion." (Id.)

In December 2014, following Padour's hearing, both Dr. Joshi and Dr. Suby Rao, Padour's hematologist, completed physical impairment questionnaires in which they were asked to assess Padour's RFC if he were placed in a competitive work environment. Dr. Joshi opined that Padour can sit, stand, and/or walk for no more than two hours in an eight-hour workday and would be occasionally limited from the use of his upper extremities. (Id. at 646.) He determined that Padour likely would be absent from work three or more times a month because of his impairments. (Id.) Dr. Joshi noted that these limitations go as far back as 2007. (Id.) Dr. Rao opined that Padour can sit for no more than three hours and stand and/or walk for no more than two hours in an eight-hour workday and that he would be frequently limited from using his upper extremities. (Id. at 645.) He determined that Padour would likely be absent from work one or more days per

---

[2] Although this letter was apparently prepared five months prior to the hearing, the record suggests that it was not submitted for the ALJ's consideration until after the hearing. The ALJ read the hearing exhibits into the record at the beginning of the hearing and these exhibits included 1A through 3F, (A.R. 41), but the June 2014 letter is identified in the record as 4F.

8

month because of his impairments. (Id.) Dr. Rao also noted, however, that his responses were not applicable to Padour's limitations as of 2007. (Id.)

**F.     The ALJ's Decision**

On June 8, 2015, the ALJ issued a decision denying Padour's claim for DIB. (A.R. 25-32.) The ALJ followed the standard five-step sequence in analyzing Padour's claims that he is disabled. *See* 20 C.F.R. § 404.1520(a). After determining that Padour met the insured status requirements for DIB through December 31, 2007, the ALJ found at step one that Padour had not engaged in substantial gainful activity after his alleged disability onset date. (A.R. 27.) In reaching this finding, the ALJ stated that she could make a finding of substantial gainful activity level earnings based on Padour's reported rate of daily pay during the relevant time period, but instead decided to give Padour the benefit of the doubt. (Id. at 28.) Turning to step two, the ALJ found that Padour's COPD constitutes a severe impairment. (Id.) At step three, she found that Padour did not have an impairment or combination of impairments that met the severity of a listed impairment. (Id.)

Before turning to step four, the ALJ determined that Padour had the RFC to perform light work with additional limitations. (Id. at 28-31.) Based on that RFC, the ALJ determined at step four that through the date last insured Padour was capable of performing his past relevant work as a golf course or nightclub manager. (Id. at 31-32.) Accordingly, the ALJ concluded that Padour was not disabled at any time from the alleged onset date through the date last insured. (Id. at 32.)

9

**Analysis**

Padour argues that the ALJ erred when, according to him, she failed to properly: (1) support her RFC determination with substantial evidence; (2) analyze credibility; (3) assess the VE's opinion as to the hypotheticals posed; and (4) apply the medical-vocational guidelines ("the grids"). This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (internal quotation and citation omitted). This court's role is neither to reweigh the evidence nor to substitute its judgment for the ALJ's. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). That said, if the ALJ committed an error of law or "based the decision on serious factual mistakes or omissions," reversal may be required. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

**A. The Treating Physician Rule**

Padour first argues that in determining his RFC the ALJ should have accorded more weight to the opinion of Padour's treating physicians instead of relying solely on the ME's assessment. Under the treating physician rule, an ALJ must give controlling weight to a treating physician's opinion if it is: "(1) supported by medical findings; and (2) consistent with substantial evidence in the record."[3] *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). If the ALJ concludes that a

---

[3] The SSA recently adopted new rules for agency review of disability claims involving the treating physician rule. *See* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017). Because these new rules apply only to disability applications filed on or after March 27, 2017, they are not applicable here. (Id.)

treating physician's opinion is not entitled to controlling weight, she must give "good reasons" for discounting the opinion, after considering the following factors:

> (1) whether the physician examined the claimant, (2) whether the physician treated the claimant, and if so, the duration of overall treatment and the thoroughness and frequency of examinations, (3) whether other medical evidence supports the physician's opinion, (4) whether the physician's opinion is consistent with the record, and (5) whether the opinion relates to the physician's specialty.

*Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016); *see also* 20 C.F.R. § 404.1527(c). As long as the ALJ articulates her reasons, she "may discount a treating physician's medical opinion if it is inconsistent" with the opinion of a consulting physician. *See Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

Here, the ALJ adequately explained why she gave Dr. Joshi and Dr. Rao's treating source statements "no weight at all." (A.R. 30.) First, she explained that the statements, which were provided after the hearing, were "prepared after the date of last insured . . . and more significantly, all address medical conditions after [the date last insured] as well." (Id.) In other words, none of the statements sufficiently address Padour's health during the relevant period. The ALJ also noted that although Dr. Joshi's December 2014 questionnaire suggests Padour would have been unable to perform even sedentary work in 2007, it was inconsistent with Dr. Joshi's June 2014 letter in which he opined that Padour's health had only recently declined in the last year. (See id. at 30 (citing id. at 593, 646).) The ALJ further found that nothing in Padour's medical record supported the limitations Dr. Joshi prescribed. (Id. at 30.)

11

In addition, the ALJ declined to give any weight to Dr. Rao's opinion in which he clearly stated that it was not applicable to Padour's condition as of 2007. (See id. (citing id. at 645).) Moreover, the ALJ properly relied on Dr. Jilhewar's opinion that Padour was capable of performing light work during the period at issue. (Id. at 31 (citing id. at 57-69).) The ALJ explained that Dr. Jilhewar reviewed the relevant evidence and provided a detailed explanation before concluding that his opinion was "best supported by the hearing level record." (Id.) Padour essentially contends that the ALJ should have weighed the evidence differently than she did, but it is not this court's role to reweigh the evidence or substitute its judgment for the ALJ's with respect to how the conflicting medical opinions should be balanced. *See Pepper*, 712 F.3d at 362. Accordingly, the court finds no basis for remand in the ALJ's analysis of the medical opinions given in this case.

**B.    Credibility Assessment**

Padour next argues that the ALJ failed to adequately consider his subjective complaints in assessing his credibility, and instead improperly relied on his daily activities in reaching her determination. Credibility determinations by the ALJ are given deference because ALJs are in a special position to hear, see, and assess witnesses. *Murphy v. Colvin*, 759 F. 3d 811, 815 (7th Cir. 2014). "Therefore, a court will only overturn an ALJ's credibility determination if it is patently wrong, which means that the decision lacks any explanation or support." *Id.* at 816. In drawing conclusions about a claimant's credibility, "the ALJ must explain her decision in such a way that allows the court to determine whether she reached her decision in a

rational manner, logically based on her specific findings and the evidence in the record." *Id.*

Initially, this court notes that it rejects Padour's contention that the ALJ improperly relied on a recently criticized boilerplate statement in assessing his credibility. Padour is right that the ALJ's credibility finding included a familiar statement that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible . . . ." (A.R. 30.) However, the Seventh Circuit has held that "[s]imply because an ALJ 'used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if she otherwise points to information that justifies [her] credibility determination.'" *Murphy*, 759 F.3d at 815 (quoting *Pepper,* 712 F.3d at 367-68). Here, the ALJ followed her summary conclusion with a detailed explanation of the evidence and the reasoning supporting it.

It is reasonable for an ALJ to consider a claimant's work history in evaluating the severity of his alleged symptoms. *See Lott v. Colvin*, 541 Fed. Appx. 702, 706 (7th Cir. 2013). In this case, after reviewing Padour's tax returns for the period at issue, the ALJ found that the documents "undermine[d] his credibility as to the allegedly disabling nature of his conditions." (A.R. 30.) For example, the ALJ noted that in 2004, the year before Padour says he became disabled, he reported driving 7,500 miles for business, (see id. at 30 (citing id. at 239)), but in 2005, the year he says he became disabled, he reported driving 12,900 miles for business, (see id. at 30 (citing id. at 252)). She also noted that in 2004 Padour claimed $3,728 in

13

business expenses with $2,500 of those expenses itemized as golf equipment, (see id. at 30 (citing id. at 243)), but in 2005, his claimed business expenses were $3,005 with $2,000 of those expenses itemized as golf equipment, (see id. at 30 (citing id. at 258)). The ALJ found that Padour "spent about the same for golf equipment during the year he allegedly became disabled and during the period of time when he reportedly was working as a nightclub manager." (Id. at 30.) She concluded that while Padour attempted to minimize the nature and extent of his work activity at the hearing, the evidence suggested that he was performing light work at levels likely commensurate with substantial gainful activity. (Id.) Thus, the ALJ primarily focused on Padour's work activities to the extent they contradicted his claim that he was not able to work. Based on her review of his tax returns, the ALJ believed that Padour's work history during the relevant period was inconsistent with his statements regarding the severity of his symptoms and his inability to work. This assessment was proper in determining the credibility of Padour's symptom description. *See Curvin v. Colvin*, 778 F. 3d 645, 651 (7th Cir. 2015) (holding that an ALJ's adverse credibility determination was not patently wrong where the claimant's testimony regarding her alleged disabling symptoms was inconsistent with other evidence that showed her impairments did not prevent her from working). Therefore, the court finds that the ALJ did not err in considering Padour's work activities in her credibility determination.

Furthermore, contrary to Padour's contention, the ALJ did in fact assess his subjective complaints. Specifically, after reviewing the medical record and opinion

14

testimony, the ALJ noted that Padour's self-reported complaints of pain were not supported by objective findings in the medical record. (A.R. 30.) Although an ALJ may not discount a claimant's symptom statements based solely on a mismatch between those statements and objective evidence in the record, "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010). The ALJ further noted that while Padour underwent some medical tests, the absence of "documented follow up or consistent regular treatment" supports a finding that Padour is capable of performing light work on a sustained basis. (Id.) Because the ALJ's credibility determination was not patently wrong and because she provided specific reasons supported by the record, this court will not overturn the determination. *See Pepper*, 712 F. 3d at 367.

**C.     Hypothetical Questions Posed to the VE**

Padour next argues that the ALJ did not properly assess the VE's opinion as to the hypotheticals posed at the hearing and, by not doing so, disregarded the VE's finding that he would not be able to perform the past relevant work of a golf course manager. Ordinarily, an ALJ's hypothetical questions to the VE "must include all limitations supported by medical evidence in the record." *Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir. 2009) (internal quotation and citation omitted). However, "the ALJ is required only to incorporate into [her] hypotheticals those impairments and limitations that [she] accepts as credible." *See id.* at 521 (internal quotation and citation omitted).

15

Here, the ALJ asked the VE three increasingly restrictive hypotheticals regarding the type of work an individual could perform depending on his ability to tolerate pulmonary irritants. (A.R. 71-74.) The VE responded that an individual who could tolerate frequent exposure to pulmonary irritants would be able to perform both the golf course and nightclub manager jobs. She initially explained that if the individual could tolerate only occasional exposure to pulmonary irritants, the golf course job would be excluded "because of the pulmonary irritants of being exposed to the weather." (Id. at 72.) After the ALJ clarified that she did not consider the weather to be a pulmonary irritant, the VE revised her answer and opined that the individual could still perform his previous jobs. The VE further opined that the individual could perform both jobs even if he were limited to no exposure to pulmonary irritants. After reviewing the evidence, the ALJ found that Padour had the RFC to perform light work, could tolerate frequent exposure to pulmonary irritants, and therefore could perform both the golf course and nightclub manager jobs. (Id. at 32.) This finding is adequately supported by the VE's opinion that the hypothetical individual who could tolerate frequent exposure to pulmonary irritants could perform both jobs. *See Shideler*, 688 F.3d at 310. Moreover, the court notes the VE also opined that regardless of Padour's weather-related limitations, he could perform his past relevant work as a nightclub manager. (A.R. 72.) Accordingly, the court finds no reason to remand on this issue as the ALJ would still find that Padour is not disabled at step four of the analysis because of his ability to perform past relevant work. *See McKinley v. Astrue*, 641 F.3d 884, 892

(7th Cir. 2011) (explaining that it would be "a waste of time" to remand a case to the ALJ where the court is convinced that the ALJ would reach the same result).

### D. ALJ's Application of Vocational Grids

Finally, Padour argues that the ALJ did not adequately assess his impairments under the grids. He argues that because he was over the age of 55 on the alleged onset date, he should have been deemed disabled under 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e). ALJs generally utilize the grids at step five of the disability analysis to determine whether the claimant's limitations prevent him or her from performing any work that exists in the national or regional economy. *Fast v. Barnhart,* 397 F.3d 468, 470 (7th Cir. 2005). Thus, the grids are only used after a finding at step four that either the claimant does not have past relevant work or can no longer perform his past work. Here, the ALJ found at step four that Padour was capable of performing past relevant work and therefore not disabled for purposes of DIB. Because the ALJ made a conclusive finding at step four that Padour was not disabled, the ALJ had no need to use the grids at step five. *See Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (holding that if the ALJ can make a conclusive finding at any step that the claimant either is or is not disabled then she need not progress to the next step).

## Conclusion

For the foregoing reasons, Padour's motion for summary judgment is denied, the government's is granted, and the final decision of the Commissioner is affirmed.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**